UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MR. AND MRS. DOE, :
for their minor child, :
    Plaintiffs, :
     :
v. : 3:13-cv-01025-WWE
     :
NEW FAIRFIELD BOARD OF :
EDUCATION, :
    Defendant. :

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this action, plaintiffs Mr. and Mrs. Doe allege that defendant New Fairfield Board of Education violated their minor child's rights under Title IX of the Education Amendments Act of 1972. Defendant has moved for summary judgment. For the following reasons, defendant's motion will be denied.

### BACKGROUND

The parties' statements of fact and exhibits establish the following factual background.

During the 2012-2013 school year, Jane Doe was in the 6th grade at New Fairfield Middle School. Her older sister, S., was in the 9th grade at New Fairfield High School. Her younger sister, A., was in 3rd grade at Meeting House School.

The Does and the M. family have known each other for many years and were very close. The families shared dinners together, vacationed together, and went skiing together.

During the 2012-2013 school year, L.M. was in the 9th grade. His sister, J.M., was in the 6th grade with Jane. Jane and J.M. were best friends. Jane slept over at J.M.'s house on an almost weekly basis.

M.C. was another close friend of Jane's.

On January 2, 2013, Jane told her mother that she had been sexually assaulted by L.M.

At first, Jane stated that the assaults had occurred on only two occasions, but over the course of the next couple of weeks, Jane indicated that they had happened on more than twenty occasions, with the first incident occurring during the summer of 2012.

The incidents consisted of L.M. touching Jane on her vagina over her clothing, touching her under her underwear, and on one occasion digitally penetrating her. The incidents occurred most often during sleep-overs at the M.'s house but also at least once in Jane's bedroom and once on a family camping trip in October 2012. Jane reported that sometimes L.M. touched her multiple times during the same evening.

Jane decided to come forward because over the Christmas holiday she saw L.M. grabbing his ten year old cousin. Jane realized it could happen to someone else, and she didn't want it to happen to her younger sister.

The Does informed Mr. and Mrs. M. of Jane's allegations toward L.M. L.M. reportedly admitted the conduct to his parents, and his parents took him in to see a therapist.

L.M.'s therapist, as a mandated reporter, notified the Department of Children and Families, who in turn contacted the police.

On January 14, 2013, the New Fairfield Police Department contacted Mrs. Doe and requested that she provide a statement against L.M. concerning the alleged sexual assaults. Mrs. Doe complied with the request and gave a statement.

On January 18, 2013, Mr. and Mrs. Doe took Jane to see a therapist. Mrs. Doe explained to the therapist that she wanted to know the extent of what had happened between Jane and L.M. The therapist recommended a forensic interview with the Multidisciplinary Team of Greater

Danbury.  On February 7, 2013, Jane had the forensic interview.

On February 26, 2013, Jane's younger sister, A., reported that she too had been sexually assaulted by L.M.

On February 28, 2013, the Multidisciplinary Team of Greater Danbury interviewed A.

On March 21, 2013, the New Fairfield Police arrested L.M. for sexual assault and risk of injury to a child.  Two separate arrest warrants were issued, one pertaining to Jane and one pertaining to A.

**Interactions with Friends**

Jane spoke with several of her friends about what had happened with L.M.  The list of friends whom Jane told of the inappropriate touching included but was not limited to J.M. and M.C.  Between January 2 and January 14, 2013, Jane told M.C. that L.M. had sexually assaulted her.

Approximately one week later, Jane spoke with J.M. in class and told her what had happened with J.M.'s older brother, L.M.  J.M. seemed surprised and almost angry.  J.M. told Jane, "You should have told sooner."  Jane does not recall any other statements J.M. made to her at that time.

On one occasion in January 2013, Jane and M.C. were in the lunchroom discussing what had happened with L.M., and M.C. likewise stated, "You should have told sooner."  Jane reported that a lot of kids were approaching her, asking if what they had heard about the assaults was true.

Jane asked M.C. if M.C. had told anybody, and M.C. responded, "Yes."

On or about February 14, 2013, Jane made a Valentine's present for J.M.  She was still

trying to maintain the friendship at that time. From Jane's perspective, her problems with J.M. arose because J.M. sided with her brother.

On February 21, 2013, while at school, J.M. stated to Jane, "It's not even that bad;" "It's not his fault;" and, "It's your fault because if you had told sooner, it wouldn't have happened." Jane mentioned that she had told J.M. before, but J.M. denied that Jane had ever told her anything. Jane observed that J.M. didn't want to believe anything she said. That same day (February 21), Jane emailed her mom, asking to be picked up early.

Ms. Huber, the School's social worker, tried to speak with Jane, but Jane declined.

That evening (February 21), Jane and J.M. went to dinner with Jane's mom at Pho Vietnam. The two girls talked, and Jane thought they had worked everything out.

On another occasion, at Jane's house, J.M. again stated, "It's not his fault." Jane does not remember the date of this incident.

At some point, J.M. stopped talking to Jane. Jane believes that the change occurred because J.M. was mad at her.

After she came forward about L.M., two of Jane's male friends, S.J. and L.F., stopped talking to her and avoided her. Jane asked them why, but they never gave an answer.

On March 1, 2013, J.M. and M.C. approached Jane at her lunch table. The girls were angry with Jane for not sitting with them.

Jane's last day in school was March 1, 2013. Jane and M.C. remained friends after Jane stopped coming to school. In late March, 2013, Jane and M.C. got into a fight. M.C. again stated that Jane should have told sooner. On or about March 26, 2013, M.C. sent Jane an instant Google Chat message from school stating:

> Ok u don't have to be my friend if you don't want to I have ½ the grade behind me on this one so tough luck for u… u can go to jail with [L.M.]… at least I wont be known in school as "the one who got molested. . .

M.C.'s message was in response to a message she received from Jane. M.C. wrote Jane an apology letter, and Jane forgave her. Jane did not have any subsequent problems with M.C.

**Interactions with L.M.**

On January 24, 2013, Jane saw L.M. in the lunchroom serving area. Jane became very upset from seeing L.M. and ran into the bathroom and cried. Jane had thought that because she had told, she wasn't going to see L.M. anymore. No one told Jane that; she just assumed.

The New Fairfield Middle School and the New Fairfield High School are connected by the lunchroom. The schools share one serving area, with the high school students entering on one side and the middle school students entering on the other side. Jane did not have lunch at the same time as any of the High School students, but a student from the High School could stop in to get water, for example. On February 14, 2013, Jane again allegedly saw L.M. in the lunchroom. She again became upset. These two occasions (January 24 and February 14) are the only times Jane recalls seeing L.M. in school after coming forward on January 2. Jane also encountered L.M. on two separate occasions when L.M. rode on her school bus. No words were exchanged between the two, and L.M. did not even look at Jane. Jane does not recall when these incidents occurred, but the last sighting may have been in the second half of February.

Jane never spoke with any adults at school concerning any problems she was

having with her peers or the fact that she had seen L.M. at school or on the bus. Ms. Huber offered to talk to Jane, and Jane knew that Ms. Huber was available if she wanted to talk, but Jane never wanted to talk to her and never told her anything. Jane never told any of her teachers that she was having problems with J.M. or M.C. Jane knew that the adults at the school wanted her to talk to them if anything happened to upset her at school.

### Interaction with School Administrators

On February 15, 2013, Mr. and Mrs. Doe met with Christine Baldelli, the Principal of New Fairfield Middle School, and Ms. Huber, and advised them that Jane had been sexually assaulted by L.M., a high school student, outside of school. This was the first notification that the school district received. During the meeting, the parents relayed that Jane was leaving school early, that they were concerned about Jane's music grade, and that they did not want Jane's attendance or grades to suffer. Ms. Baldelli assured Jane's parents that her attendance would not be a concern, and that they would accommodate Jane's schedule to help her stay successful academically. The parents mentioned that Jane had told other kids in school what had happened with L.M. Mr. and Mrs. Doe mentioned that Jane had begun counseling, but that she was resistant.

Ms. Baldelli and Ms. Huber repeatedly suggested that if Jane felt uncomfortable at school, she should speak with Ms. Huber. Mrs. Doe responded that Jane would not feel comfortable with that. The parents explained that Jane did not want to speak with any adults about what had happened. Therefore, they did not want Jane approached or pulled aside to discuss. Ms. Huber stated that she would be available to support Jane as needed. Ms. Baldelli and Ms. Huber advised the parents to follow up with any concerns. That same

6

day (February 21), Ms. Baldelli notified Dr. Roy, the Superintendent of Schools, of her meeting with Mr. and Mrs. Doe. Ms. Baldelli reported to Dr. Roy that L.M. had sexually assaulted Jane off campus during the previous summer. Ms. Baldelli did not mention any conflict between Jane and J.M. The next communication between the Does and the school occurred on February 21, 2013.

      While Mrs. Doe was at the school to pick up Jane on February 21, she met with Ms. Huber and reported that Jane was upset about something that had happened with J.M. Ms. Huber asked if she could speak with Jane to find out what happened. Jane agreed to come into the office, but she did not speak at all about what had happened. Mrs. Doe took her daughter home and told Ms. Huber that she would follow up later in the day. Ms. Huber thereafter notified Ms. Baldelli that Mrs. Doe had picked up Jane early, that Mrs. Doe reported there was a bullying issue starting with J.M. saying negative things to Jane, that Jane was unwilling to speak about what had happened, and that Mrs. Doe was going to follow up later that day with more information. Ms. Huber suggested that she and Ms. Baldelli discuss how to intervene. Ms. Huber called Mrs. Doe later that day both to inform her that she needed a signed release in order to speak with Jane's therapist, Vicki Michalek, and to find out what had happened with Jane at school. Ms. Michalek had called Ms. Huber that day to discuss how to keep Jane in school, and Ms. Huber explained that she needed a signed release to discuss.

      On February 22, 2013, Mr. and Mrs. Doe came into the school to sign the release authorizing Ms. Huber to speak with Ms. Michalek. The parents informed Ms. Huber that Jane and J.M. had talked the night before and had worked things out between them.

7

On February 28, 2013, Mr. Doe picked up Jane early from school because she was upset. Ms. Huber again offered to speak with Jane about why she wanted to leave early and to get more information about triggers in the school environment.

On February 28, 2013, Ms. Baldelli notified Dr. Roy that she was concerned that Jane had called to go home early, but that she would not talk to school staff about what was going on. On Friday, March 1, 2013, Ms. Baldelli and Ms. Huber met with Mr. Doe. Mr. Doe expressed concern that his daughter was being "bullied" by J.M. He referenced the earlier conversation wherein J.M. had stated to Jane that she should have told sooner and that what had happened to her was not that bad. Mr. Doe also reported an incident that had occurred at lunch that day. He reported that J.M. and M.C. had approached Jane at her lunch table, and one of them stated to Jane, "If you don't sit with us, you can't be our friend." Ms. Baldelli stated that she would follow up with J.M. and her family and advise them that J.M. should not be talking to Jane. Mrs. Doe believes she also called Ms. Baldelli about the lunch room incident. Mrs. Doe reported that J.M. and/or M.C. stated to Jane, "You can't just dump us. You know, we're not going to be your friends anymore if you sit with these [other] girls."

The following Monday, March 4, 2013, Ms. Baldelli and Ms. Huber met with Mrs. M. and her daughter, J.M. Mrs. Baldelli explained to J.M. and her mother that Mrs. Doe had reported that J.M. had said to Jane, "You should have told sooner," and was making Jane feel uncomfortable. J.M. explained that Jane was discussing the abuse with their mutual friends, and that there was an occasion when J.M. was upset and embarrassed and did not know what to say in the social setting. Therefore, J.M. responded that it wasn't that

bad and that Jane should have told sooner. J.M. also reported that kids had been asking her if it was true and that the situation was difficult for her. The school personnel explained that such remarks are inappropriate and unacceptable, discussed how the two girls needed some space, and asked J.M. to not have any further contact with Jane. Ms. Huber was offered as a resource for J.M. The school officials did not perceive J.M.'s comments as mean-spirited.

Ms. Baldelli notified Jane's parents that she had spoken with J.M. and her mother and that she had directed J.M. to stay away from Jane. Ms. Baldelli advised Dr. Roy of J.M.'s remark ("You should have told sooner."), and that she had spoken with J.M. and her mother about the matter.

On March 4, 2013, Ms. Huber spoke with Ms. Michalek. They discussed Jane's resistance to counseling. Ms. Michalek shared that she was meeting with Jane later that afternoon for the first time in a few weeks. They also discussed Jane's attendance issues and a joint effort to keep her in school. Ms. Michalek did not mention to Ms. Huber any incidents with other students. They merely discussed encouraging Jane and J.M. to go their separate ways.

On March 4, 2013, Mrs. Doe called Dr. Roy to request a meeting. Mrs. Doe explained that she wanted to discuss removing L.M. from school. Dr. Roy explained that she would not meet for that purpose and that she could not remove L.M. from school.

On March 5, 2013, on their way to parent-teacher conferences, Mr. and Mrs. Doe asked to meet with Ms. Huber. Mr. Doe reported that Jane was refusing to come to school because she was being tortured by her peers. He referenced peers talking about the

9

traumatic events and her former best friend pressuring her to come over to her house for a visit.  Mr. Doe also reported that Jane was afraid of seeing L.M. at school, having seen him twice near the cafeteria.  The parents expressed their frustration that their concerns were not being heard at the administrative level and that L.M. was still attending school.  Ms. Huber listened and offered her support.

That same day (March 5), Ms. Huber received a message from Ms. Michalek reporting that Jane had demonstrated increased anxiety during her session the night before and that the parents were encouraged to let Jane stay home for the day.

Ms. Huber was out of the office on March 6, 2013.  Mrs. Doe left a message stating that Jane would not be in school that day, and Ms. Michalek left a message stating that it was not safe for Jane to return to school where she could potentially see her perpetrator.

On March 6, 2013, Ms. Baldelli offered tutoring if Jane needed a break from school.  On March 12, 2013, Mrs. Doe advised Ms. Baldelli that they would like to begin tutoring for Jane.  Ms. Baldelli took immediate steps to get the tutoring started.

On March 15, 2013, Dr. Roy met with Mr. and Mrs. Doe.  The parents spoke about the molestation of both their daughters, indicating that the assaults had occurred the previous summer.  The parents reported that an arrest was imminent and again asked what the plan was for getting L.M. out of school.  Dr. Roy explained that an expulsion hearing was separate from the police matter and that she would need Jane or the police to testify before the Board of Education if they went that route and that in her experience it had been the victims who had testified.

Tutoring commenced on March 19, 2013, and continued for the remainder of the

school year.  Jane worked with three tutors for her different subjects.  She did not have any trouble with her school work.

On March 21, 2013, Officer Lang of the New Fairfield Police Department notified Dr. Roy that L.M. had been arrested that morning.  Mr. Doe likewise called Dr. Roy to alert her to the arrest.  Mr. Doe informed Dr. Roy that L.M. was in school that day.  Mr. Doe opined that the police officer could testify at an expulsion hearing.

On March 21, 2013, Dr. Roy contacted Board counsel to discuss how to proceed.  That day, Dr. Roy asked Officer Lang if he could testify at an expulsion hearing.  Officer Lang said that he could not.

On March 22, 2013, Dr. Roy called Mrs. M. to discuss the charges against L.M.  Dr. Roy asked Mrs. M. if, in an effort to avoid expulsion, the family would voluntarily keep L.M. out of school and place him in tutoring.  Mrs. M. was shocked that L.M. could be expelled and promised to call back.

Dr. Roy spoke with Mr. Doe and told him that she had reached out to the M. family, and that the Board had been notified.

On March 25, 2013, Dr. Roy met with both Mr. and Mrs. M.  The parents reported that they had voluntarily kept L.M. out of school that day, and they agreed he would not return.

On March 25, 2013, Dr. Roy spoke with Mr. Doe and advised him that Mr. and Mrs. M. had agreed to keep L.M. out of school.  Mr. Doe initially said fine, but he called back later stating that he and his wife wanted L.M. expelled.  That same evening, Mrs. M. called Dr. Roy to inform her that she had spoken with L.M. about the plan to keep him out

of school voluntarily.  Dr. Roy informed Mrs. M. that she had made arrangements that afternoon for L.M. to be tutored 10 hours per week.

On March 26, 2013, Ms. Baldelli asked Ms. Huber to meet with M.C. because her father had reported that she had received an upsetting email from Jane.  Ms. Huber met with M.C., who was confused and upset by the email because she had slept over Jane's house that weekend and everything was fine.  Ms. Huber asked M.C. to not respond.  Unbeknownst to Ms. Huber, however, M.C. had already responded.

On March 27, 2013, Mrs. C. called Ms. Baldelli and reported that she had spoken with Mrs. Doe because M.C. had sent Jane a horrible text message.  Mrs. C. told her that she could obtain the message from Mrs. Doe.  Mrs. Doe forwarded the exchange to Ms. Baldelli.  The exchange included a message from M.C. to Jane to the effect of, "You are always going to be known as the girl who was molested."  Ms. Baldelli advised Mrs. Doe that she had spoken with M.C.'s parents and that the situation was being handled.

On March 28, 2013, Ms. Huber spoke with M.C. about the message chain.  Ms. Huber addressed the severity of what M.C. had written.  M.C. presented as remorseful and discussed writing an apology letter to her friend.  M.C. served an in school suspension for sending Jane the mean instant message.  M.C. also lost her in school computer privileges.  Ms. Baldelli notified Dr. Roy of the message and the disciplinary consequence given.

On April 5, 2013, Mr. and Mrs. Doe met with Ms. Baldelli and Ms. Huber and requested that Jane be tutored through the end of the year.  The parents also wanted a contingency plan in place in case Jane could not return to school the following year.  Ms. Baldelli stated that she would make sure that, for the following year, Jane was on a

separate team from any girls that she felt uncomfortable with. The 6th grade field trip was discussed. Ms. Baldelli assured the parents that Jane would not be on the same trip with any of the girls with whom she felt uncomfortable. The following Tuesday, Mrs. Doe advised Ms. Baldelli that Jane did not want to attend the field trip.

The same day (April 5), Mr. Doe called Dr. Roy to request an out of district placement for Jane for the following school year. Dr. Roy explained that they would need to have a team meeting.

On April 8, 2013, Ms. Huber called Ms. Michalek. Ms. Michalek shared that Jane was still resistant to therapy and that she would not be returning to school for the remainder of the year. Ms. Michalek represented that she and the parents all hoped that Jane could return to school in the fall.

On April 11, 2013, a Section 504 meeting was held for Jane. Jane was found eligible for 504 accommodations due to documented PTSD symptoms.

On April 24, 2013, a planning and placement team meeting was held regarding Jane. At the PPT meeting, Mrs. Doe again asked about a placement at another school, but she was unsure about proceeding with an evaluation. Mrs. Doe signed the consent with the understanding that she could rescind it. Mrs. Doe did in fact rescind the consent to have Jane tested.

Dr. Roy asked Barbara Mechler, the Title IX coordinator, to inquire whether there was something more going on than what she was aware and to take a look at the matter from a Title IX angle. On April 30, 2013, Ms. Mechler reached out to Mrs. Doe as directed. Ms. Mechler told Mrs. Doe that she would follow up with Dr. Roy. Ms. Mechler

reported back to Dr. Roy that Mrs. Doe did not want to file a complaint at that time. Dr. Roy and Ms. Mechler agreed that Ms. Mechler would send Mrs. Doe the sexual harassment complaint form anyway in case the Does changed their mind. Ms. Mechler sent Mrs. Doe a letter confirming that Mrs. Doe had said that she did not see value in filing a sexual harassment complaint at hat time, but included the complaint form anyway.

Mrs. Doe sent a letter back denying that she had said she didn't see any value in filing a sexual harassment complaint. Mrs. Doe never filed a complaint.

Steps were taken during the summer and fall of 2013 to make sure that Jane could return to school for the 2013-14 school year. Jane had a successful return to school in the fall of 2013. J.M. and L.M. were no longer in the school district. Jane continued to do very well academically throughout the year and was involved in many sports. Jane did not have any further problems with M.C.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable

inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

**Deliberate Indifference**

Defendant argues that plaintiffs' Title IX claim fails as a matter of law because, *inter alia*, no reasonable jury could find that defendant was deliberately indifferent to known sexual harassment of plaintiffs' daughter.  Plaintiffs contend that defendant's responses to plaintiffs' grievances were minimal and ineffective.

Recipients of federal education funding may be liable under Title IX for deliberate indifference to known acts of peer sexual harassment.  Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 643-49 (1999).  However, neither eradication of harassment nor particular disciplinary action is required for school boards to avoid liability, as schools should enjoy flexibility sufficient to account both for their level of disciplinary authority and for their potential liability arising from certain forms of disciplinary action.  Id. at 648-49.  Under most circumstances, courts should refrain from second-guessing the disciplinary decisions made by school administrators.  Id. at 648.

"[F]unding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is

so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650. To avoid liability, a school must merely respond to known harassment in a manner that is not "clearly unreasonable." Id. at 648-49. On a motion for summary judgment, a court may identify a school's response as not "clearly unreasonable" as a matter of law. Id. at 649.

Plaintiffs argue that they have presented ample evidence for a jury to find deliberate indifference to their daughter's harassment. In support, plaintiffs argue that defendant failed to follow its own District policy on student sexual harassment. Plaintiffs submit that defendant's response measures were otherwise unreasonable. For example, the five times the Does allegedly asked Ms. Baldelli to say or do something to J.M. between February 15 and March 1, 2013, they said or did nothing. Plaintiffs also take exception to defendant's failure to notify Jane and J.M.'s teachers about the risks of the situation; or to "investigate" M.C., "freeing" her to send abusive text messages. Ms. Baldelli failed to notify the Title IX coordinator until more than two months after her first meeting with the Does. Moreover, defendant's measures, including having Jane come talk to the school's social worker, were ineffective in preventing J.M. from harassing Jane. Plaintiffs contend that with knowledge of the futility of the school's solution, defendant persisted in offering the same answers.

Plaintiffs argue that defendant minimized the effect of the perpetrator's presence on Jane. Even after the police had found probable cause for an arrest, nobody at the school took the necessary precautions of investigating the circumstances of Jane's encounters with L.M. Defendant insisted on direct victim testimony for any expulsion hearing. Finally,

16

instead of acting to expel L.M., defendant relied on the perpetrator's voluntary withdrawal to protect the victim, and defendant could not guarantee that L.M. would not return to school for the following school year.

"[D]eliberate indifference is often a fact-laden question, for which bright line rules are ill-suited." Doe ex rel. Doe v. Hamden Bd. Of Educ., 2008 WL 2113345, at *6 (D. Conn. May 19, 2008).  This Court has held that "the mere fact that the Board allowed [the perpetrator] to continue to attend school through graduation without facing any disciplinary action, despite his having been arrested for sexual assault, may be considered by a reasonable jury to have been an unreasonable response to the situation." Id. at *7 (citing Doe ex rel. Doe v. Derby Bd. Of Educ., 451 F. Supp. 2d 438, 447 (D. Conn. 2006)). Resolving disputed facts in favor of plaintiff, the Court finds that the issue of deliberate indifference is a genuine issue of material fact best put to a jury.

**Hostile Educational Environment**

Defendant argues that summary judgment should be granted in its favor because the alleged conduct in this case was not severe and pervasive.

A school board can be liable for "deliberate indifference to known post-assault harassment in a context subject to the school district's control, if the harassment was so severe, pervasive, and objectively offensive that it can be said to deprive plaintiff of access to the educational opportunities or benefits provided by the school." Doe v. Hamden at *5.

> [A] jury may find that [the perpetrator's] presence at school, combined with further intimidation by his friends, negatively affected [the victim's] ability to concentrate in school, earn passing grades, or attend certain classes, and may thereby conclude that by failing to discipline [the perpetrator] or otherwise intervene, the Board was deliberately indifferent to severe harassment that denied [the victim] of her educational opportunities.

Id.

Here also, a jury could find that the perpetrator's presence at school, combined with further intimidation by the perpetrator's sister and others, negatively affected Jane's educational opportunities. Indeed, "[f]urther encounters, of any sort, between a [sexual assault] victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school." Id. In the instant case, defendant failed to discipline L.M. Accordingly, plaintiff has presented a genuine issue of material fact as to whether the harassment was sufficiently severe so as to create a hostile educational environment.

### Conduct Based Upon Sex

Defendant argues that plaintiffs' claim fails because the alleged conduct was not bases on Jane's sex. Defendant contends that "[t]he remarks had nothing to do with the fact that Jane was female," and "were not sexual in nature." The Court is not persuaded.

First, remarks at issue in this case were clearly sexual in nature. For example, on March 26, 2013, M.C. sent Jane an instant Google Chat message from school stating: "at least I wont be known in school as 'the one who got molested.'"

Second, defendant's argument ignores the fact that the issue of the L.M.'s presence at school with Jane is implicitly sexual in nature because the accusations against L.M. were of sexual assault.

Third, defendant has presented no case law supporting this theory – that a student-victim of sexual assault's complaints of harassment related to the assault were not based on sex. Accordingly, the Court finds no merit to this argument.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED. The Court will refer this case to a magistrate judge for a settlement conference and set a date for trial.

Dated this 26th day of January, 2016, at Bridgeport, Connecticut.

    /s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE